OPINION OF THE COURT
Roger S. Hayes, J.
*367 Defendant is charged with 15 counts of criminal possession of a forged instrument in the second degree (Penal Law § 170.25), four counts of criminal possession of computer related material (Penal Law § 156.35), and three counts of criminal possession of forgery devices (Penal Law § 170.40 [2]). Defendant has filed an omnibus motion seeking dismissal or reduction of the charges and other relief. Based on my findings of fact and conclusions of law set forth in part I below, defendant’s motion to dismiss or reduce is denied. The remainder of defendant’s omnibus motion is dealt with in part II of this decision.
I.
THE MOTION TO DISMISS OR REDUCE
Findings of Fact
In light of the absence of controlling authority and the complexity of the main issue presented in defendant’s motion to dismiss or reduce, it is appropriate to summarize the evidence presented to the Grand Jury. Various witnesses described the operational mechanics of the cellular telephone industry. Cellular telephone service is available from "home carriers”— commercially owned and operated communication networks— that use individual cellular telephone units which have wireless radio transmission capabilities, operating among a series of "cells” or geographic areas served by radio antennae. Each cellular telephone has two identifying numbers programmed into it: one from the manufacturer of the unit and the other from the home carrier. An "electronic serial number” (ESN) is an 8-digit number programmed by the manufacturer onto a semiconductor chip, which identifies the cellular telephone in which it is installed. A "mobile identification number” (MIN) is a 10-digit telephone number (area code plus 7 digits) assigned to the cellular telephone by the home carrier when a customer subscribes to that carrier’s service. The MIN enables the home carrier to bill the subscriber for each use of the service. When a call is placed from a cellular telephone, the telephone transmits both the ESN and MIN to the cellular system which uses the ESN/MIN "pair” to validate the call.
If the ESN and MIN are reproduced without authority in another cellular telephone, then the cellular telephone of the legitimate customer has been "cloned” and the "cloned” phone can make unauthorized calls that can be billed to the legitimate customer. A "cloned” unit emits pirated ESN/MIN infor *368 mation programmed into the device which, without authorization, identifies an actual subscriber’s account. Calls made on a "cloned” phone will be charged to a specific, identifiable, existing account until the subscriber recognizes and reports the unauthorized charges.
At about 8:30 p.m. on August 12, 1995, Sergeant David Klein-man of the Bronx Task Force, other police officers, including Officer Marc Nell, and United States Secret Service agents, including Agent Robert Weaver, were conducting a roadblock at East 241st Street and White Plains Road in Bronx County. At some point, the officers and agents received a tip that the owner of the City Line Deli at 4826 White Plains Road was "cloning telephones” in the deli. Pursuant to that information, at about 8:35 p.m. Sergeant Kleinman, Agent Weaver and other officers and agents entered the deli.
Inside, Sergeant Kleinman saw cellular telephones on a counter near a cash register and computer equipment behind the counter. Agent Weaver recalled seeing a laptop computer on the right side of the counter. Sergeant Kleinman and Agent Weaver saw defendant alone behind the counter. In response to Agent Weaver’s questioning, defendant identified himself as the owner of the deli and allowed the officers and agents to search it. During the search, defendant unlocked a storage area, and inside Agent Weaver saw a computer and a monitor. Sergeant Kleinman and Agent Weaver subsequently discovered a small office at the top of a staircase in the back of the deli. In response to Agent Weaver’s questioning, defendant unlocked the door to the office, and inside Sergeant Kleinman and Agent Weaver saw two computers hooked up by "cloning cables” to cellular telephones. The men also saw paper, computer disks and record books. Agent Weaver looked at the display on the computer monitors and, in light of his training in electronic crime, connected the displayed information with software programs intended to facilitate "cloning”. Agent Weaver asked defendant, "[I]s this your stuff?” to which defendant replied, "[W]ell, all this stuff is mine.” Agent Weaver then asked defendant whether the "stuff in the room” was his, and defendant responded, "the phone thing, that’s mine, that’s my stuff”. At that point, defendant was arrested.
Meanwhile, Officer Marc Nell recovered Motorola cellular telephones and other telephonic and computer equipment, including a Packard Bell desktop computer, a Canon Inova laptop computer and a Toshiba 3100E laptop computer. Officer Nell recovered the Packard Bell and Canon computers from *369 the small office; each computer was attached to a Motorola cellular telephone. Officer Nell recovered the Packard Bell computer from either the deli counter or the storage area. In addition to the two phones attached to the computers, Officer Nell recovered 14 Motorola cellular telephones from the deli. Additionally, Officer Nell recovered 24 computer disks from the desktop in the small office, two disks from defendant’s person, five record books and a box of color-coded stickers. Finally, at some point Officer Nell photocopied a ledger which was inside the desk in the small office; the ledger contained a list of ESN numbers.
At about 1:05 p.m. on August 30, 1995, Secret Service Agent Charles Stone, extensively trained in the detection of "cloned” phones and "cloning” equipment, tested the 16 Motorola phones for evidence of "cloning.” As to 15 of those phones, Agent Stone concluded 10 had been fully "cloned” and five had an altered ESN. Agent Stone tested the three computers seized in the deli and discovered that they contained software programs used to "clone” cellular telephones.
Peter White, the Director of Revenue Security for AT&T (formerly Cellular One), reviewed the account records for the ESN/MIN pairs found in four of the telephones and determined that the ESN/MIN pairs were owned by AT&T. Defendant did not have permission from AT&T to possess, duplicate, alter or copy those ESN/MIN pairs.
Conclusions of Law
Primarily, defendant claims that "cloned” or altered cellular phones do not constitute "written instruments” and "forged instruments” as those terms are defined in the Penal Law. Accordingly, defendant moves to dismiss or reduce the criminal possession of forgery devices counts and the criminal possession of a forged instrument in the second degree counts. The claim has some surface appeal. Few people would conceive of a telephone as a "written instrument”. However, the Penal Law’s definitions of "forged instrument” and "written instrument” are sufficiently broad to include a "cloned” or altered cellular telephone.
Given the lack of controlling authority on this issue, the court deems it appropriate to discuss it in detail. A person is guilty of criminal possession of forgery devices when he makes or possesses with knowledge of its character any equipment specifically designed for use in counterfeiting or otherwise forging "written instruments”. A person is guilty of criminal *370 possession of a forged instrument in the second degree when he utters or possesses any "forged instrument of a kind specified in section 170.10” of the Penal Law. Penal Law § 170.10 (1) lists specific examples of "forged instruments”, including a "deed, will, codicil, contract, assignment, commercial instrument” and "credit card”. However, the section also contains a very broad catchall clause which defines another "kind” of "forged instrument”, namely, an "instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status”. The first question is whether a "cloned” or altered cellular telephone fits within this broad definition.
The court concludes that it does. Both the carrier and the lawful user of a cellular telephone have an "interest” in an ESN/MIN pair, for the numbers allow the carrier properly to bill the user. When another person surreptitiously obtains the legitimate user’s ESN/MIN pair and inputs it into another phone or attempts to do so, that person is undermining the ability of (1) the user to be billed only for authorized use of the cellular phone service and (2) the carrier properly to bill the user and otherwise prevent unauthorized users from obtaining cellular phone service, and, accordingly, is "affect[ing] a legal * * * interest”.
Research has disclosed only a single case on point. In People v Garcia (170 Mise 2d 543 [Westchester County Ct]), the court dealt with precisely this issue on a defense motion to dismiss a count of criminal possession of a forged instrument in the second degree based on the alleged "cloning” of cellular telephones. The court denied the motion, holding (at 549): "The evidence before the Grand Jury was sufficient to support the charge of criminal possession of a forged instrument in the second degree: the cloned computer 'chip’ in the cellular telephone found in the vehicle contained encoded computer data; computer datá is specifically enumerated in the definition of 'written instrument’ contained in Penal Law § 170.00 (1); this instrument 'does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status’ as defined in Penal Law § 170.10 (1); and the cloned chip was 'falsely made’ as that term is defined in Penal Law § 170.00 (4), insofar as the evidence before the Grand Jury indicated that it had been encoded without the authorization of the rightful owner of the telephone number programmed into it. Therefore, the knowing possession of a cloned cellular telephone chip with the intent to defraud, deceive or injure an *371 other constitutes the crime of criminal possession of a forged instrument in the second degree. Under the facts of this case, guilty knowledge can readily be inferred from the defendants’ possession and use of equipment used in the process of cellular phone 'cloning.’ Thus, the evidence presented was sufficient to support this count of the indictment.”
As to the criminal possession of forgery devices counts and the criminal possession of a forged instrument in the second degree counts, the evidence sufficiently established that the cellular telephones, which contain the computer chips within them, were "written instruments.” A cellular telephone constitutes an "instrument or article”[1] which contains an MIN and/or an ESN as well as a serial number, all of which are identification symbols. Clearly, a "cloned” telephone is a "forged instrument”[2] since it fits the definition of a "written instrument” and has been falsely altered by means of implanting a legitimate user’s ESN/MIN data into its chip.
As to the criminal possession of forgery devices counts, the Grand Jury evidence sufficiently proved that defendant possessed, with knowledge of its character, equipment specifically designed for use in counterfeiting or otherwise forging ESN/ MIN numbers for the purpose of "cloning” cellular telephones. Specifically, defendant admitted ownership of three computers that, with their specialized software, clearly were designed to facilitate the "cloning” process.
Defendant raises several ancillary claims. First, defendant claims that the People were required to introduce evidence as to the "origin of the phones from which an inference could be drawn that the phones were not obtained directly from the manufacturer or that they did not bear the manufacturer’s original ESNs”. However, while searching the deli, Sergeant Kleinman and Agent Weaver saw two cellular phones connected by a cable to two computers. From his training Agent Weaver recognized the cable as a "cloning cable” and discerned from the information displayed on the computer monitors that *372 the computers contained software programs designed for "cloning” phones. Also recovered was a ledger containing a list of ESN numbers. Moreover, defendant admitted that the computer equipment and telephones were his. Finally, Agent Stone tested the phones and computers and discovered that the phones had been fully or partially "cloned” and that the computers contained "cloning” software. From this and other evidence, one can readily infer that defendant "cloned” and/or altered the ESN of each phone. While mere possession of the phones would not permit the inference that defendant knew even the ESN of each phone, much less that it had been altered, defendant’s admitted ownership of what was essentially an ongoing computerized "cloning” operation manifestly permits such an inference.
Next, defendant claims that the People were required to introduce evidence that the ESN and MIN on each phone belonged to a legitimate customer "to preclude the possibility that a legitimate user cloned his own phone”. Needless to say, the evidence precludes the possibility that defendant was a legitimate user of the 15 ESN/MIN pairs. Rather, that evidence inexorably leads to the conclusion that defendant pirated the ESN/MIN information in connection with an illicit "cloning” operation in the deli. As noted above, the totality of the evidence established that defendant admitted ownership of the numerous cellular phones and computerized "cloning” equipment in the deli and that at least two phones were in the process of being "cloned” when the police and agents arrived. In short, the evidence of the operation’s size and complexity makes unreasonable the hypothesis that defendant was a legitimate subscriber. To the contrary, it establishes circumstantially that defendant was appropriating ESN/MIN pairs without permission to further his illicit "cloning” business.
Defendant also questions whether the People established a sufficient chain of custody to provide reasonable assurance that the phones and computers seized and vouchered by Officer Nell, and which are the subjects of the charges, were the same ones tested by Agent Stone. However, Officer Nell identified each phone by serial number and/or ESN, and each computer by its manufacturer and/or model. Agent Stone identified each tested phone by MIN and serial number, and also by the manufacturer’s ESN and/or the altered ESN; he identified each tested computer by its manufacturer and/or model. The court cross-referenced that information and, in so doing, ascertained that each phone and computer tested by Agent *373 Stone constituted one of the phones and computers recovered by Officer Nell.
Additionally, defendant claims that White’s testimony contained inadmissible hearsay and that White should have given a basis for his alleged conclusion that he was the "lawful custodian” of the ESNs which he referred to in his testimony. However, White’s testimony was based on account records which were properly introduced into evidence under the hearsay exception for business records. Moreover, White did not testify that he was the "lawful custodian” of the ESNs. Rather, he explained that the ESNs were the property of AT&T, and that he was merely "in charge of the department that maintains [AT&T’s] business records and for subpoena compliance and other law enforcement related functions”.
Finally, the court has reviewed the instructions given by the prosecutor to the Grand Jury. Based on that review, the court is satisfied that the prosecutor properly instructed the Grand Jury on the applicable law, including circumstantial evidence.
In sum, the Grand Jury evidence established that the "cloned” or altered cellular telephones referred to in the indictment constituted both "forged instruments” and "written instruments.” The evidence was legally sufficient in all respects, and the instructions to the Grand Jury were proper. Accordingly, defendant’s motion to dismiss or reduce a charged count is denied.
II.
THE REMAINDER OF THE OMNIBUS MOTION
In light of the above decision, defendant’s motion for disclosure of the Grand Jury minutes to defense counsel is denied. Defendant’s motion for a Mappl Huntley/ Dunaway hearing is granted on consent. Defendant’s motion for an order directing compliance with his request for a bill of particulars and discovery is denied. Defendant’s motion for the return of seized property is denied.

. Penal Law § 170.00 (1) defines "written instrument” as: " 'Written instrument’ means any instrument or article, including computer data or a computer program, containing written or printed matter or the equivalent thereof, used for the purpose of reciting, embodying, conveying or recording information, or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person.”

. Penal Law § 170.00 (7) defines "forged instrument” as: " 'Forged instrument’ means a written instrument which has been falsely made, completed or altered.”